MAKAR, J.
At issue is whether the trial court made a definitive ruling regarding the competency of Linda Koshenina (Linda) to make a designation declaring her husband, James Koshenina (James), her preneed guardian, and whether the trial court correctly determined it was appropriate for John L. Buvens and Carole Ann Buvens Draper, *278 Linda’s brother and sister (Siblings), to be appointed her plenary co-guardians rather than her husband. For the reasons that follow, we remand for a determination of whether Linda was competent when she designated her husband as her preneed guardian and, if so, whether the statutory presumption in favor of this appointment “is contrary to the best interests of’ Linda under the existing circumstances.
I.
Sometime in 2010 at age fifty-seven, Linda began showing signs of mental deterioration and was subsequently diagnosed with Pick’s Disease — a rapidly progressive and terminal form of dementia. Because of the disease, Linda lost the ability to care for herself, interact socially, or control her behavior. She is unable to live independently and all parties — including James, Linda’s husband — agree that Linda needs care in a twenty-four hour, seven-days a week facility thereby excluding any arrangement where she would return to her home with her husband, even temporarily.
In January 2012[1], the Siblings successfully petitioned for appointment of themselves as emergency temporary guardians of Linda, alleging she was being abused, neglected, or exploited. The allegations stemmed, in large part, from injuries Linda sustained from a fall while she was at Emeritus, a twenty-four hour care facility. On the first day of her stay at Emeritus, Linda fell and injured her eye; she also sustained bruises on her body that were not immediately noticeable, but which later became apparent the morning after James returned Linda to Emeritus (he initially would take her home some nights so she could sleep in her own bed). The resulting bruises prompted Emeritus staff to contact the Department of Children and Families (DCF), which launched an investigation. The case was eventually turned over to the State’s Attorney Office, but no charges were ever filed and DCF later closed the case when the Siblings were appointed emergency co-guardians of Linda. No evidence exists that her injuries resulted from anything other than Linda’s falls at Emeritus.[2]
In response to the Siblings’ petition, James filed a notice of Designation of Pre-need Guardian (Designation), which Linda had executed on November 29, 2010, designating him as her preneed guardian. The attorney who drafted the Designation testified that prior to having her sign the document, Linda successfully completed a routine competency test that he administered. He testified that it was his practice to ensure that clients such as Linda understood what they were doing, and that he would not have allowed her to execute the document if he felt she failed the test.
Approximately four weeks before executing the Designation, however, Linda failed certain medical cognitive tests during a neuropsychological consultation. Dr. Glen, her consulting neurologist, indicated that Linda was “extremely impaired” on some tasks (such as responding “I don’t know” to many tasks, even when given very specific cues and “yes” or “no” instructions), but not on others. Dr. Glen was also concerned about Linda’s behavior *279 (such as her unprompted statements regarding her love for James); he also was concerned about James’s sometimes “erratic” and disruptive behavior.
Dr. Doty, the neurologist who began treating Linda a year after she executed the Designation, also expressed doubts as to whether Linda knew what she was signing at the time, but she acknowledged that patients such as Linda experienced “lucid intervals” in which they were able to function normally.
At the two-day evidentiary hearing on their petition, the Siblings sought to prove the Designation was invalid either because Linda was incompetent when she made it or because of James’s undue influence on her. Except for Dr. Doty’s testimony expressing doubt that Linda could have understood what she was signing (a year before Dr. Doty first began treating her), the Siblings offered no expert testimony that Linda was incompetent or incapacitated at the time she executed the Designation.
The evidence at the evidentiary hearing generally established that James was contentious at times and that he failed — in the initial stages of her care — to provide proper hygiene for Linda and did not fully follow her doctor’s medical instructions. For instance, James' would meddle with Linda’s medical and caregiving team about her care including creating a ruckus at Emeritus and at Dr. Doty’s office. According to nursing staff documentation, he was found once kicking Linda’s bed, which agitated her, resulting in the medical staff calling security to get him to leave. Dr. Doty testified that James would over- or under-medicate Linda — which included, for example, giving her aspirin, something he thought was a “cure all.” Before Linda was placed in the twenty-four hour care facility at Emeritus, James infrequently washed Linda’s hair, allowing it to become “oily” and would let her toenails go un-dipped for long periods of time. Despite his boisterous and somewhat contrarian persona and caregiving flaws, however, everyone agreed that James loves Linda, that he and Linda were affectionate with each other, and that Linda looked forward to James seeing when he came to visit her. To counter the Siblings’ petition and their' claim they were better suited to care for Linda, James introduced evidence that pri- or to Linda’s illness the Siblings made infrequent contact with her. Of the thirteen years James and Linda were married, Linda skipped Thanksgiving with her family for nine of those years.
Thereafter, trial court found that Linda suffered no abuse at the hands of James and that all her injuries were a result of her progressing disease. The trial court further found, however, that Linda had done better in the care of the Siblings as emergency temporary guardians than she had done in James’s care and that James’s personality and social skills were not conducive to making appropriate decisions for the care of Linda. Further, although Linda executed the Designation naming James her preneed guardian, it was executed only “after the dementia process had seriously compromised her ability to understand what she was doing” and the trial court “seriously questioned” — despite possible lucid intervals that Linda may have experienced — whether Linda understood what she was doing when she executed the document. The trial court stopped short, however, of finding Linda incompetent at the time she executed the Designation. It went on to conclude that it was not in Linda’s “best interest” to honor Linda’s preference expressed in the designation “because of the [cjourt’s findings regarding events subsequent to the execution of this document.” The trial court named the Siblings as plenary co-guardians of Linda, *280 but prevented them from removing her from the Sunrise facility and restricted James’s visitation.
Both parties moved for rehearing, James making an as-applied constitutional challenge to the guardianship statute. The trial court modified its order to allow the Siblings to take Linda to doctor’s appointments outside of the Sunrise facility, but denied both motions for rehearing, finding that neither the guardianship laws nor the court’s order violated James’s and Linda’s fundamental privacy rights, and that the Siblings’ motion was meritless. This appeal followed.
II.
We review the probate court’s appointment of a guardian for abuse of discretion. Acuna v. Dresner, 41 So.3d 997, 999 (Fla. 3d DCA 2010); In re Guardianship of Schiavo, 851 So.2d 182, 186 (Fla. 2d DCA 2003), rev. denied, 855 So.2d 621 (Fla.2003). . “The appointment of guardian is a discretionary act of the trial court, which must be supported by logic and justification and founded on substantial competent evidence.” Morris v. Knight, 1 So.3d 1236, 1238 (Fla. 4th DCA 2009) (a. “trial court’s decision should be reviewed for reasonableness.”). The trial court’s discretion in appointing a guardian is limited, however, by the requirement that it must be exercised consistent with the law. Wilson v. Robinson, 917 So.2d 312, 313 (Fla. 5th DCA 2005).
A.
We begin by observing that the trial court failed to rule on the core question of whether Linda was competent at the time she executed the Designation that James act on her behalf as preneed guardian. Remand is necessary for the trial court to rule on this fundamental issue. See Mason v. State, 489 So.2d 734, 737 (Fla.1986) (no per se rule in Florida forbidding a nunc pro tunc competency determination); State v. Williams, 477 So.2d 356 (Fla. 1st DCA 1984) (same). During oral argument, James urged this Court to hold that in the context of guardianship proceedings, determining a ward’s competency requires only a finding that the ward is capable of understanding that she is selecting a person she trusts. We reject this approach, however, because it would not require the ward to understand the implications of the document she is signing, something we believe is critical to making an informed decision.
Rather, we hold that the appropriate test for determining whether a ward was competent to make a decision regarding who will be her preneed guardian, is whether the ward had the capacity to generally understand the nature of the decision she is making and its implications. This test is analogous to that used in the context of testamentary capacity cases, which requires that a testator understand in a general way the nature and extent of his property to be disposed of, the testator’s relation to those who would naturally claim a substantial benefit from his will, and the effect his disposition will have. See, e.g., In re Estate of Edwards, 433 So.2d 1349, 1350 (Fla. 5th DCA 1983).
On remand, the trial court must weigh the competing testimony and evidence and come to a definitive ruling on this issue using this standard. The evidence below on this issue can be harmonized or perhaps viewed as conflicting. On one hand, the testimony of the attorney who helped Linda execute the Designation indicated that Linda was able to pass a routine competency exam immediately before she signed the document. On the other hand, weeks before she executed the Designation, Linda failed medical cognitive tests with Dr. Glen. It could be that she exhibited cogni *281 tive failures on her visit with Dr.- Glen, only to have a period of lucidity weeks later at the attorney’s office. Or the trial court could credit entirely the doctor’s/lawyer’s testimony, finding she lacked/retained the mental competence to execute the designation. In light of this equivocal evidence, the trial court did not make a ruling, but strongly intimated that Linda may not have been competent to execute the Designation when she did. While it is understandable, if not human nature, to avoid making a difficult judgment call in an emotionally-charged guardianship proceeding, it must be done for the benefit of clarity in determining whether the statutory requirements are met. If, on remand, Linda is deemed to have been competent to execute the designation of her husband as preneed guardian, this designation is entitled to a rebuttable presumption, which leads next to our consideration of the appropriate legal standard that would apply.
B.
The trial court did not rule on Linda’s competency, but it appears to have assumed that even if she had been competent when executing the designation, her husband was not the best choice in light of evidence showing his sometimes obstreperous conduct. In doing so, the trial court ruled that it was “in the best interest of the Linda for her brother and sister to be appointed plenary co-guardians of her person.” We conclude, however, that this ruling applied an incorrect legal standard.
Section 744.3045(4), Florida Statutes (2010), provides in pertinent part that “[production of the declaration in a proceeding for incapacity shall constitute a rebuttable presumption that the preneed guardian is entitled to serve.” But a trial court “shall not be bound to appoint the preneed guardian if the preneed guardian is found disqualified[3] to serve as guardian.” Id. Furthermore,
if the person designated is qualified to serve ..., the court shall appoint any standby guardian or preneed guardian, unless the court determines that appointing such person is contrary to the best interests of the ward.
§ 744.312(4), Fla. Stat. (2010) (emphasis supplied). Here, the trial court was required to apply this statutory standard, meaning that the rebuttable presumption of James’s entitlement to serve as his wife’s preneed guardian could' only be overcome by a specific, factually-supportable finding that appointing James was “contrary to the best interests of’ his wife. See, e.g., Miller v. Goodell, 958 So.2d 952 (Fla. 4th DCA 2007) (rebuttable presumption that ward’s sister, who was designated as alternate preneed guardian, was entitled to serve as guardian was overcome with trial court finding that appointment was contrary to ward’s best interest.) Instead, the trial court made an independent determination of what it believed was in Linda’s best interest.
Had section 744.312(4) been written to say that trial courts could simply apply a generalized “best interest” analysis— without consideration of whether the appointment of the preneed guardian “is contrary to the best interests of the ward”— the trial court’s analysis would be appropriate. But context and language matter. Once a determination is made that a ward competently designated a preneed guardian, that determination is entitled to deference and respect else the now-incompetent ward’s desires be too easily impeded, if not *282 thwarted entirely.[4] This designation is one of life’s most intimate and important decisions involving highly personal and private judgments about who will provide care, love, and support when persons are unable to do so for themselves. It is why the legislature established a rebuttable presumption that the preneed guardian is “entitled to serve” absent disqualification or a finding that appointment “is contrary to the best interests of the ward.”
The linguistic distinction between what “is contrary to the best interest of the ward” and what may be in the “best interests” of a ward is subtle, but its legal ramifications are potentially life-altering, particularly in the context of overriding a ward’s personal designation of whom she wants to act on her behalf on private, personal health matters. This designation can be said to reflect what the ward believed was — and would be — in her long-run best interest. Overriding the statutory presumption in favor of the ward’s appointment of the designated preneed guardian is thereby no minor matter. It cannot be overcome with a generalized “best interest” approach; instead, the judicial mind must ask how is the appointment of the ward’s chosen guardian sufficiently “contrary” to her best interests that the court should disregard the ward’s choice and appoint someone else?
Admittedly, little judicial analysis exists on how the statutory standard at issue in section 744.312(4) (i.e., “is contrary to the best interests”) contrasts with a generalized “best interest” approach. At a minimum, that another relative might be a better caregiver is not enough under section 744.313(4) to unseat the designated preneed guardian; the ward’s designation of the preneed guardian — instead of the relative — reflects the ward’s preference on the matter. Similarly, the statutory standard requires more than a finding that a designated preneed guardian is lacking in interpersonal and social skills. For instance, in this case the record is bereft of any finding that James — and his bull-in-the-china-closet approach to caring for Linda — is anything other than his persona as Linda understood him to be. She may have dearly wanted a loving husband (no one disputes they love each other) aggressively advocating for her as she enters a life/health care environment that can be daunting to those unaccustomed to protocols and expectations within the walls of the medical community. Contrarily, a ward’s designation does not provide a guardian license to ignore medical directives and create disorder within a facility or office. Likewise, that James allowed Linda’s hair to get oily and her nails lengthy weighs against him. But at the time of the hearing below it was undisputed by everyone that Linda would not be going home again; instead, her hygienic and medical care was to be provided by the facility, not by James.
Accordingly, given the inherent flexibility of and lack of definitive caselaw on what constitutes a ward’s “best interest,”[5] the standard in section 744.312(4) is best understood as creating a hurdle to show that *283 specific actions/inactions of the designee are sufficiently egregious as to be “contrary to” the “best interests” of the ward thereby justifying a change in the status quo (or here, rebutting the presumption that a preneed guardian should be appointed). General examples exist, though not in this specific context.[6] Should the trial court on remand determine that Linda was competent when executing the Designation, and that James is her presumptive preneed guardian, the plain reading of section 744.312(4) requires an approach that gives greater deference to Linda’s designation and requires a showing that — based on Linda’s expected residence in a total care facility — her husband should not serve as her preneed guardian because his appointment “is contrary to” her “best interests.”
REVERSED and REMANDED for proceedings consistent with this opinion.
WOLF, and ROBERTS JJ., concur.

. On April 19, 2012, in a related proceeding, the trial court found Linda totally incapacitated.

. After they were appointed emergency temporary co-guardians, the Siblings refused, over the course of seven months, James's many requests to move Linda from Emeritus. They eventually consented to moving her into a new facility called Sunrise after Linda fell two more times at Emeritus and broke her collar bone, nose, and a rib, bruised her brain, and received stitches above her eye.

. Section 744.309(3), Florida Statutes, specifies grounds for disqualification such as conviction of certain felonies. No contention was made below that James is disqualified under this provision.

. In light of our decision, we need not address the possible constitutional dimension of this type of personal decision under the state constitution’s provision that “Every natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein.” Art. I, § 23, Fla. Const.

. See, e.g., Whitton, et. al., Surrogate Decision-Making Standards for Guardians: Theory and Reality, 2012 Utah L. Rev. 1491, 1498 (2012) ("The lack of statutory guidance on the meaning of “best interest” may explain, in part, why there is so little case law on the meaning of the standard. Typically, best interest issues arise in judicial opinions only when the guardian has egregiously breached the standard by neglecting the incapacitated person, or by engaging in self-dealing”) (cit *283 ing specific examples from Delaware, Ohio, Pennsylvania, Iowa, and New York).

. See, e.g., Morris, 1 So.3d 1236 (affirming trial court’s finding that a ward’s minimally involved family members were not appropriate persons to appoint as guardians); Davis v. King, 686 So.2d 763 (Fla. 5th DCA 1997) (finding conflict of interest rebutted the statutory presumption that a preneed guardian entitled to serve as guardian); In re Guardianship of Stephens, 965 So.2d 847, 851-52 (Fla. 2d DCA 2007) (reasoning it was contrary to a ward’s best interest to appoint any member of the ward’s dysfunctional family as guardians). See also Duke v. Duke, 522 So.2d 258 (Ala.1988) (reversing trial court decision that appointment of son as guardian of incapacitated mother was contrary to mother’s best interest where there was no evidence son was dishonest, financially irresponsible or self-dealing, or uncaring and did not tend to her needs); In re Moses, 273 Ga.App. 501, 615 S.E.2d 573 (2005) (affirming trial court's decision to appoint ward’s sister rather than daughter as guardian of the person where although there was statutory preference for children over siblings, evidence showed ward expressed preference for sister and daughter was neglectful and abusive to ward); In re Hodgman, 269 Ga.App. 34, 602 S.E.2d 925 (2004) (finding no abuse of discretion for trial court to depart from statutory preference in appointing guardians where evidence demonstrated son mismanaged ward's assets, acting in a manner contrary to the ward's best interest); Brown v. Storz, 710 S.W.2d 402 (Mo. App. E.D.1986) (holding evidence supported appointment of mother as guardian of incompetent ward where substantial evidence demonstrated ward’s spouse was a habitual drunkard); see also Whitton, supra note 5, at 13.