WARNER, J.
Glenda Martinez appeals an order appointing professional guardian John Cram-er as plenary guardian for her husband, Alan Smith (“ward”). She maintains that the trial court erred in failing to apply the statutory presumption of section 744.3045(4), Florida Statutes (2012), where the ward had given her power-of-attorney and appointed her as his preneed guardian and health care surrogate. Because the trial court failed to make a specific finding that appointment of appellant was contrary to the best interests of the ward, we reverse.
The ward and appellant met on a senior social networking website in December 2008. According to appellant, the ward was separated from his wife and intended to marry appellant. In October 2009, the ward executed a designation of health care surrogate, naming appellant both his *396 health care surrogate and his preneed guardian, as well as a durable power-of-attorney in her favor. It is undisputed that these designations were made when the ward was competent.
In January 2010, the ward was in an automobile accident and suffered a subdural hematoma. Shortly thereafter, his daughter petitioned the court to appoint a plenary guardian, alleging he was incapacitated due to “fronto temporal dementia[.]” The court appointed the ward’s son as limited guardian of the ward’s property, removing the ward’s rights to contract, manage property, and make any gift or disposition of property. The court did not specify the cause of the ward’s incompetency; the court noted he was “adjudicated to be incapacitated by Order of this Court entered concurrently herewith,” but that order does not appear in the appellate record.
After the son resigned as guardian, the court appointed professional guardian John Cramer as successor limited guardian on November 8, 2010. The order appointing Cramer noted: “If the right of the Ward to Contract has been delegated to the Guardian but the right to marry is retained, then the right to marry is subject to court approval.” The ward divorced his first wife and married appellant on December 28, 2011.. Appellant continued to care for the ward and direct his health care.
About a year later, Cramer petitioned to be appointed as the ward’s plenary guardian. He alleged, “The nature of the Ward’s alleged incapacity is frontotempo-ral dementia.” He alleged that the designation of health care surrogate was “no longer an alternative to guardianship of the person” because appellant was not acting in the ward’s best interests.
Multiple proceedings ensued. Cramer was appointed emergency temporary guardian of the ward, which appellant appealed, and this court reversed for failure of the trial court to appoint counsel for the ward. See Martinez v. Cramer, 121 So.3d 580 (Fla. 4th DCA 2013). Appellant also moved to disqualify the trial judge and filed a petition for writ of prohibition with this court, which petition was granted. See Martinez v. Cramer, 111 So.3d 206 (Fla. 4th DCA 2013).
Meanwhile, in the trial court, appellant also filed a response opposing Cramer’s petition for plenary guardianship. She gave four reasons for opposing the appointment of Cramer as plenary guardian. First, the court was required, under section 744.312(3)(a) and (c), Florida Statutes (2012), to consider the wishes of the ward in determining whom to appoint as guardian, and the ward had indicated she should be so appointed in his designation of health care surrogate, living will, and durable power-of-attorney. Second, the ward’s designation of her as his preneed guardian gave rise to a rebuttable presumption that she was entitled to the appointment under sections 744.102(16), 744.312(4), and 744.3045(4), Florida Statutes (2012). Third, the court should give preference to her as the ward’s wife, under section 744.312(2)(a), Florida Statutes (2012). Finally, appointing a guardian was not the least restrictive alternative because the health care surrogacy, living will, and durable power-of-attorney adequately protected the ward. Subsequently, she amended her response to argue that Cramer should not be appointed because of his hostile relationship with appellant; because he had failed to adequately care for the ward during his emergency temporary guardianship, as the ward had “been inflicted with numerous illness and injuries” since that appointment; and because the ward could no longer afford to pay a professional guardian.
*397 At a hearing on the petition, the court questioned the validity of the marriage because of the order requiring court approval. However, as that issue is subject to another appeal, we will not discuss the issue of the marriage further.
The court heard testimony regarding the ward’s condition and the nine changes of residence of the ward over the three years that Cramer had been limited guardian. Each change was explained by the appellant and Cramer. Appellant also wanted to move the ward from his current placement, but Cramer disagreed, believing that the ward needed stability for his health. Nevertheless, since his move into the current facility, the ward had developed pneumonia twice, once requiring a nine-day hospitalization. According to an aide who took care of the ward, appellant was instrumental in seeing that the ward got to the hospital to treat his pneumonia.
The aide confirmed that Cramer visited the ward for about fifteen minutes twice a month. Appellant, on the other hand, vis-. its about every three days, stays for hours, and brings flowers, cards and letters. The aide testified appellant “shows a lot of love to [the ward.]” Nevertheless, appellant’s efforts and advocacy on behalf of the ward to get him the proper treatment created conflict with the facility’s staff and also with the ward’s appointed counsel. Appellant had accused the facility of “trying to kill” the ward and Cramer of “trying to steal [the ward’s] money and trying to kill him[.]” Both the ward’s counsel and staff at the facility opined that appellant was not a good health care surrogate because she wanted to move the ward from their facility.
Appellant also testified, explaining the necessity of each change of residence. She also testified to the inadequacy of the care administered in the present facility. When the ward contracted pneumonia (most likely from his roommate who died), the nursing staff did not want appellant to take the ward to the hospital. Appellant called paramedics, and he was transported there and placed in intensive care.
Cramer argued to the court in closing that appellant as a health care surrogate for the ward was not a suitable alternative to guardianship, because appellant did not communicate calmly and rationally with the facility’s staff. He contended that she was abusing her power as a health care surrogate by interfering with his care.
Appellant, on the other hand, argued that the ward had made the decision, while competent, that “[i]f [the ward] found himself needing a guardian and he found himself incapacitated, he wanted [appellant], the one person at that point he knew he loved and loved him that would take care of him.” She argued the Florida Statutes created a rebuttable presumption that appellant, as preneed guardian, should take care of him. She disputed that her decisions to take the ward to the hospital were to his detriment. She argued, “There’s simply insufficient evidence that [appellant] is unqualified to serve as guardian, and so she should be permitted to do so.” The court asked appellant’s counsel to concede there was “an inability to communicate with the people who are in charge of this man’s care[.]” Counsel did not admit that but said, “[T]here’s certainly an inability to agree on the course of care in his present facility.”
In the order on appeal, the court appointed Cramer as plenary guardian and revoked appellant’s authority as health care surrogate pursuant to section 765.105(5), Florida Statutes (2012), because appellant had “moved the Ward multiple times and does not communicate properly with the Ward’s caregivers and other interested persons.” The court declined to give preference to appellant as *398 the ward’s wife under section 744.312(2)(a) because she “and the Ward failed to seek court authority for their marriage as required by Order dated November 8, 2010, and ... the marriage was improper[.]” However, the court found appellant “loves and cares for the Ward and Order[ed] the Guardian to allow [appellant] unfettered visitation with the Ward.”[1]
Appellant argues the court erred by failing to apply the statutory presumption favoring the ward’s preneed designation of a health care surrogate and guardian, and that there was insufficient evidence to overcome this presumption. Where the trial court determines the re-buttable presumption in favor of a pre-need guardian has been overcome and appoints a different guardian, this decision is reviewed for an abuse of discretion. See Miller v. Goodell, 958 So.2d 952, 954 (Fla. 4th DCA 2007). “[T]he rebuttable presumption ... may only be overcome by substantial, competent evidence.” Acuna v. Dresner, 41 So.3d 997, 999 (Fla. 3d DCA 2010).
“A competent adult may name a preneed guardian by making a written declaration that names such guardian to serve in the event of the declarant’s incapacity.” § 744.3045(1), Fla. Stat. (2012). “Production of the declaration in a proceeding for incapacity shall constitute a rebuttable presumption that the preneed guardian is entitled to serve as guardian.” § 744.3045(4), Fla. Stat. (2012).
Section 744.3045(4), Florida Statutes (2012), also provides that “[t]he court shall not be bound to appoint the preneed guardian if the preneed guardian is found to be unqualified to serve as guardian.” § 744.3045(4), Fla. Stat. (2012) (emphasis supplied). Section 744.309, Florida Statutes (2012), lists the requirements for qualification to serve as a guardian, such as age, residency or relation to ward, as well as those matters which would disqualify a person from being a guardian, such as commission of a felony. Pursuant to those provisions appellant is qualified to serve.
In addition, section 744.312(4), Florida Statutes (2012), provides, “If the person designated is qualified to serve pursuant to s. 744.309, the court shall appoint any ... preneed guardian, unless the court determines that appointing such person is contrary to the best interests of the ward.” (Emphasis supplied.) The court in this case did not make a finding that appellant’s appointment was contrary to the best interest of the ward.
This case is similar to Koshenina v. Buvens, 130 So.3d 276 (Fla. 1st DCA 2014). In Koshenina, the trial court appointed the ward’s siblings as co-guardians, contrary to the ward’s preneed designation of her husband. Id. at 278-80. The First District found the trial court improperly applied the presumption in section 744.312(4), because the trial court only found that appointment of the siblings was “in the best interest of the [ward].” Id. at 281. The court reasoned:
Here, the trial court was required to apply this statutory standard, meaning the rebuttable presumption of [the husband’s] entitlement to serve as his wife’s preneed guardian could only be overcome by a specific, factually-supportable finding that appointing [the husband] was “contrary to the best interests of’ his wife.... Instead, the trial court made an independent determination of what it believed was in [the ward’s] best interest.
*399 [[Image here]]
[T]he standard in section 744.312(4) is best understood as creating a hurdle to show that specific actions/inaetions of the designee are sufficiently egregious as to be “contrary to” the “best interests” of the ward thereby ... rebutting the presumption that a preneed guardian should be appointed....
Id at 282-83 (citation omitted). Acknowledging that “little judicial analysis exists” as to how to apply this standard, the court held, “At a minimum, that another relative might be a better caregiver is not enough- Similarly, the statutory standard requires more than a finding that a designated preneed guardian is lacking in interpersonal and social skills.” Id. at 282. In language which might also apply to this case, the First District found that although the preneed guardian had a “bull-in-the-china-closet approach to caring for” the ward, the ward “may have dearly wanted a loving husband (no one disputes they love each other) aggressively advocating for her as she enters a life/health care environment that can be daunting....” Id. Accordingly, the court reversed the appointment. Id. at 283. See also Acuna, 41 So.3d at 1000 (reversing appointment of guardian, contrary to preneed designation, as abuse of discretion because trial court misinterpreted preneed designation and because the court “did not make a factual finding that any of the daughters was unqualified, unwilling, or unable to serve as guardian”).
In the present case, Cramer stipulated that the ward had appointed appellant his preneed guardian. This appointment was in the designation of health care surrogate document, which stated:
If I am at any time determined to be an incapacitated person, as that term is defined in the Florida Guardianship Law ..., I declare that my health care surrogate named herein shall serve as plenary guardian of the person, to exercise all delegable legal rights and powers and to perform all tasks necessary to care for my person.
However, Cramer argued against appellant’s appointment on the grounds that “[s]he could not communicate rationally or calmly” with him as the guardian of the ward’s property, the ward’s court-appointed attorney, or the staff at the facility. The record in this case appears similar to Koshenina, in that appellant had a “bull-in-the-china-closet” approach to the ward’s healthcare, which caused conflicts with Cramer and the facility’s staff. The mere existence of conflict with the staff of the nursing facility, however, does not show that her appointment would be contrary to the best interests of the ward. Indeed, she may need to advocate forcefully to get the ward the care he needs. From this record it is apparent that several of the facilities in which the ward was placed were not providing adequate care. There is also a question in the evidence as to whether the present facility is adequately attending to the ward’s needs. For instance, despite the testimony from the staff and the ward’s counsel that the staff was properly treating the ward’s pneumonia and that appellant wrongfully admitted him to the hospital, Cramer himself testified that the ward was in the hospital for nine days. That hardly is evidence that the staff was properly caring for the ward.
It is not surprising that someone strongly advocating for excellent care for their loved one would be at odds with a staff which may be less than diligent in delivering such care. Even where a nursing facility’s staff is caring, staffing levels may be such that patients wait a long time for a member of the staff to attend to even the most basic of needs. While we do not know that is the case in this institution, the *400 conflict revealed by the evidence is simply that appellant and the staff have poor interaction, not that appellant has done anything to harm the ward.
In revoking appellant’s powers as health care surrogate, the court found appellant “has moved the Ward multiple times and does not communicate properly with the Ward’s caregivers and other interested persons.” The only language in the order regarding the preneed guardian designation is: “The Court has considered the wishes expressed by the Ward and appoints John M. Cramer despite those wishes pursuant to the reasons stated above.”
■ Thus, the trial court failed to make an explicit finding that appellant was unqualified or that her appointment would be contrary to the ward’s best interests. Instead, the court appointed Cramer, the professional guardian who visits with the ward only fifteen minutes twice a month, to care for the ward. The trial court abused its discretion by failing to honor the ward’s choice of a guardian without finding that appointment of his designated preneed guardian was contrary to his best interests.
By appointing Cramer and refusing to enforce the health care surrogate designation, the trial court essentially revoked the designation. Section 744.3115, Florida Statutes (2012), provides:
In each proceeding in which a guardian is appointed under this chapter, the court shall determine whether the ward, prior to incapacity, has executed any valid advance directive under chapter 765. If any advance directive exists, the court shall specify in its order and letters of guardianship what authority, if any, the guardian shall exercise over the surrogate. Pursuant to the grounds listed in s. 765.105, the court, upon its own motion, may, with notice to the surrogate and any other appropriate parties, modify or revoke the authority of the surrogate to make health care decisions for the ward.
(Emphasis supplied.) One of the grounds listed in section 765.105 is: “The surrogate or proxy has abused powers[.]” § 765.105(5), Fla. Stat. (2012). The trial court relied on this ground in its ruling.
Florida law gives little guidance on what constitutes the proxy’s abuse of power. However, since it is a ground for revocation of the health care designation, the court should look to that document to determine what powers were assigned to the surrogate. That document provides the following powers under its “Grant of Authority”:
1. I grant to my health care surrogate full authority to make decisions for me regarding my health care, including the authority to make decisions regarding mental health treatment, and any reference herein to health care shall include mental health care. In exercising this authority, my health care surrogate shall follow my desires as set forth in this document or as may be otherwise known to my health care surrogate and my health care surrogate shall attempt to reach the decision that I would make if capable. If my health care surrogate cannot determine the choice I would have made, then my health care surrogate is authorized to act for me based upon what my health care surrogate believes to be in my best interests. In exercising such powers, my health care surrogate shall attempt to discuss with me the specifics of any proposed health care decision if I am able to communicate in any manner, and my health care surrogate is authorized to consult with other health care consultants or health care providers in reaching such decisions. My health care surrogate shall *401 have full power and authority to execute all instruments, and to do everything appropriate and necessary to be done for me in my name regarding my health care.
2. My health care surrogate is hereby authorized as follows:
(a) to have final authority to act for me and to make health care decisions, as defined in Chapter 765 of the Florida Statutes, as amended, for me in matters regarding my health care during my incapacity;
(b) to consult with the appropriate health care providers to provide informed consent in my best interests and to make health care decisions for me which my health care surrogate believes that I would have made under the circumstances, had I been capable of making such decisions;
(c) to consent, refuse to consent, or withdraw consent to any and all types of medical care, treatment, surgical procedures, diagnostic procedures, medication and to the initiation or use of mechanical or other procedures that replace any bodily function including the administration or withdrawal of nutrition and hydration, by using the appropriate consent forms;
(d) to appoint any person, including my health care surrogate, to act as my Patient Advocate, who shall have the same power and authority as my health care surrogate;
(e) to apply for public benefits, such as Medicare and Medicaid, for me, to submit on my behalf any claims or documentation required to any private insurance company with which I may have an effective policy for medical care benefits, and to have access to information regarding my income and assets to the extent required to make such application; provided that a health care provider may not, however, make such application a condition of continued care if I, if capable, would have refused to apply;
(f) to employ and discharge medical personnel including physicians, psychiatrists, and surgeons, nurses, and therapists as deemed necessary and to pay them (or cause them to be paid) a reasonable compensation;
(g) to exercise my right of privacy and my right to participate in decisions regarding any of my medical care even if the exercise of such rights might hasten my death;
(h) to take any action not specifically described above necessary to carry out the intent of this document;
(i) to authorize or refuse to authorize any pain-killing medication or surgical or medical procedures of any kind helpful, even though such medications or procedures may lead to permanent damage, addiction, or hasten my death;
(j) to make arrangements for the- treatment of my terminal illness under the auspices of a hospice, if I should qualify for such care. I understand that acceptance into hospice care entails foregoing curative treatment and life-sustaining procedures, such as the administration of nutrition and hydration (food and water) through a feeding tube or resuscitation in case of cardiac arrest, and that foregoing such procedures might hasten my dying. I hereby consent to hospice care under such conditions, and direct my health care surrogate to make any and all necessary arrangements for me to receive such care, including the signing of such consent forms as may be required by the hospice, any third party payor, and/or the federal government;
(k) to contract on my behalf for any health care related service or with any health care related facility, without my *402 health care surrogate waiving personal financial liabilities for such contracts;
(l) to sue third parties at the expense of my estate as fully as I might for their failure reasonably to comply with instructions given by my health care surrogate, to compel compliance with my wishes as determined by my health care surrogate, or to seek damages (including punitive damages) for the failure to comply; and
(m) to authorize my transfer and admission to or from a health care facility.
The trial court’s finding that appellant has moved the ward several times and does not communicate well with the present facility’s staff does not show that appellant “abused powers” granted to her by the designation. The appellant had the authority to transfer the ward, and the trial court made no findings that the various transfers were contrary to the ward’s best interest. Nor would this record support such a finding. There were adequate reasons for each transfer, which were largely uncontested by Cramer.
Nor would conflict and difficulty communicating with the staff at the facility be an abuse of power. Although Cramer contended that appellant was interfering with the ward’s care, the testimony shows that appellant was demanding more care for the ward than the staff thought was required. Since the ward left decisions regarding his care to the appellant, and not the staff of the facility, this cannot be treated as an abuse of power, unless her decisions are contrary to his wishes, as expressed in the designation. No one has shown that they are. For these reasons, we conclude that the trial court erred in revoking the designation for appellant’s abuse of power.
We do not address the issue of whether appellant was entitled to preference in appointment as the ward’s guardian as his wife, as the validity of the marriage is the subject of a separate appeal. Regardless of her status as his wife, she was still his designated health care surrogate, and as such she is entitled to the statutory presumption that she is qualified to serve unless it is contrary to the best interests of the ward.
We reverse the order appointing Cram-er as plenary guardian of the ward and remand for further proceedings.
CIKLIN and GERBER, JJ., concur.

. At oral argument, counsel for appellant noted that appellant has now been barred from visiting with the ward.