PER CURIAM.
In their consolidated appeals, Summer Jasser, Lena Mamone, and Anthony Saa-deh, the children of appellee, Karim Saa-deh, appeal five orders, arising out of proceedings to determine the incapacity of their father as well as the appointment of an emergency temporary guardian.[1] In connection with these proceedings, Saadeh executed a trust agreement, the validity of which was later contested by him after competency proceedings were dismissed. The crux of this appeal is a challenge to the court’s summary judgment determining that the trust was void ab initio. Because we conclude that the court correctly determined that Saadeh did not have legal authority to create the trust, we affirm the summary judgment.
Karim Saadeh, now in his eighties, emigrated from Jordan with his wife, raised a family of three children, and became a very successful businessman. He and his wife were wealthy at the time of his wife’s death in 2007. After her demise, Saadeh contemplated remarrying.
Saadeh met a younger woman through one of his wife’s relatives. He loaned her money, which greatly disturbed his children even though he had his lawyer draw up a promissory note. The children then worried about his other substantial bank accounts on which they were named ac-countholders. The children became concerned that their father was not completely competent and expressed that concern to his business and estate planning attorney, Michael Singer. To prevent Saadeh from draining his accounts, the children transferred over a million dollars from these accounts to other accounts over which he had no control without his knowledge.
Saadeh was upset when he discovered that his children had drained his accounts. Around the same time, he discovered that *243 substantial money and jewelry located in a safe were missing. Because his children had the combination to his safe, he suspected that they had likewise taken these assets. He called the police, who then made a report of the theft. In the report, the children denied taking the money and jewelry from the safe; however, they admitted transferring the monies from the bank accounts. The police report states that the officer found that Saadeh appeared in control of his faculties. Still angry about what he considered his children’s deceit, Saadeh removed his remaining funds from the bank to prevent his children from acquiring more of his money-
In November 2008, Saadeh visited a neurologist because of some memory loss issues. The doctor found that despite the memory loss, he was competent and scored appropriately on tests. His condition was basically unchanged from an exam that occurred three years earlier. Six months later, Saadeh visited the neurologist again. Even though Saadeh scored nearly the same on all of the administered tests but one, the neurologist diagnosed him as being in the high stages of dementia, probably Alzheimer’s.
At the end of April 2009, after Saadeh met several times with Singer, Singer wrote to the children. The letter explained that based upon the attorneys meetings with Saadeh, he thought that Saadeh was completely capable of managing his own affairs. Singer informed them that Saadeh had revoked his power of attorney and health care surrogate, under which his children could exercise powers. Instead, Saadeh appointed his long-time accountant William Levine as attorney in fact and health care surrogate. In the letter, Singer demanded the children return the money they removed from the accounts.
The children consulted a lawyer, Col-lette Meyer, who works with a professional guardian, Deborah Barfield. On May 5, 2009, Barfield visited Saadeh on the ruse that she was somehow connected with his deceased wife’s family. At that meeting, Saadeh complained to her about his children’s actions with his money. Based upon that meeting, on May 12, Barfield filed a petition to determine Saadeh’s incapacity, alleging that he had Alzheimer’s dementia, attaching the neurologist’s report.
In the petition, Barfield alleged that Saadeh needed a guardian appointed to exercise all delegable rights of the ward. As is required under section 744.331(2)(a), Florida Statutes (2008), the court appointed an attorney, Jacob Noble, to represent the ward. Saadeh’s original attorney was not notified of the proceedings. In addition, the court appointed an examining committee. At the same time, Barfield filed a petition for the appointment of an emergency temporary guardian and scheduled a hearing for May 18.
Singer learned of the hearing, but could not attend because he was out of town. He sent his partner to the hearing to object. Because the court had appointed another attorney to represent Saadeh, and no motion for substitution had been made, the court denied a continuance. The court then conducted the hearing on the appointment of the emergency temporary guardian.
At the hearing, the neurologist testified that he observed in Saadeh an increased inability to function even though he admitted that the testing did not change much from his previous testing. He told the court that he was concerned with Saadeh managing his own affairs and giving away money as exemplified by the loan to the younger woman. The neurologist specifically stated that Saadeh should not retain *244 the right to contract. The court also heard from a bank employee who related an incident in which bank personnel thought that Saadeh was making a threat against his children and himself. Barfield testified to her meeting with Saadeh, in which he related his complaints against his children. She did not believe that the children had taken anything from his safe, and she implied that his belief constituted part of the reason that he needed a guardian.
Counsel called one of the ward’s daughters. She expressed her concern for her father giving away his money. In cross-examination, she was asked, “If your father were to give you money right now, do you believe he would lack the capacity to give that money to you?” She answered yes.
On behalf of Saadeh, his court appointed-attorney called a tenant of Saadeh to relate that in all her dealings with him over the years, he acted appropriately and did not exhibit any inability to handle his affairs, even recently. He also called Saa-deh, who testified about his fractured relationship with his children. Saadeh explained the professional guardian’s ruse in coming to his house to question him. He denied making any threats against his children.
Although the court did not make a formal determination of incapacity, it appointed Barfield as emergency temporary guardian (ETG) because the court found that the evidence showed that Saadeh was diagnosed with high stage Alzheimer’s and was in danger of financial abuse. In so doing, the court removed all of Saadeh’s rights, except his right to vote. Despite the fact that no one testified that he could not drive, the court also took away his right to drive. The order appointing Bar-field as ETG delegated to her the power to exercise all delegable legal rights and powers of the ward with the exception of his right to vote. Pursuant to statute, the court set the term of the temporary guardianship for ninety days.
The day after the hearing, two of the members of the examining committee filed their reports, both stating that Saadeh was fully capable of managing his own affairs and was completely competent. Unfortunately, the third person appointed to examine Saadeh passed away before the hearing. It does not appear that the court ever saw these reports. Within two days of the appointment of the ETG, Singer filed an emergency petition to set aside the guardianship and for rehearing. The ward’s court-appointed attorney joined in the petition and also moved for rehearing.
The next day, only three days after the appointment of the ETG, Meyer, the attorney for the ETG, and the appointed counsel for Saadeh, submitted to the court an agreed order to “settle” the guardianship. The parties agreed that execution of a trust would be the “least restrictive alternative to plenary guardianship in this matter.” The May 21 order provided for Saa-deh to execute a trust agreement with his children serving as co-trustees, which could be amended only with consent of the co-trustees. Upon Saadeh’s death, the trust assets would be distributed to the children. Saadeh would also execute a pour-over will, naming his three children as his co-personal representatives, and devising the residue of his estate to his children. In addition, Saadeh would create a new healthcare surrogate designation, appointing his three children as his surrogates. The ETG would acquire all of Saa-deh’s assets and place title to them in the trust. Thereafter, the ETG could seek leave of court for her discharge. The order provided that Saadeh shall execute the trust, will and healthcare surrogate within seven days. The last provision of the or *245 der states that “All pending incapacity proceedings for the Ward in this Court are hereby dismissed, subject to the Court’s retention of jurisdiction to enforce the terms of this Agreed Order if necessary.” At the same time, the court dismissed the examining committee and denied the pending petition to set aside the guardianship filed by Singer the day before. It does not appear that Singer was notified of any hearing on this issue.
After the petition to set aside the guardianship failed, the accountant, Levine, who had power of attorney [POA] and who was Saadeh’s current health care surrogate, filed his own petition to set aside the guardianship and requested rehearing. In his petition, Levine alleged that he had never been provided notice of the ETG proceedings. He attached the reports of two doctors, who stated that Saadeh was competent to attend to his own affairs. The court scheduled this motion for hearing on June 25, 2009.
Despite the fact that the agreed order “dismissed” the pending incapacity proceedings, neither the parties nor the court operated as though anything was dismissed. A few days after entry of the agreed order, Noble, the court-appointed attorney for the ward, filed a motion for clarification of the order appointing the ETG. The court entered an order of clarification. In addition, both sides filed motions to disqualify attorneys. Noble wanted to disqualify Singer from representing Levine, and Singer sought to disqualify Meyer from representing Barfield because Meyer simultaneously represented Saa-deh’s children. In addition, Noble complained that Levine was not forwarding bills that the ETG was required to pay on behalf of Saadeh, thus acknowledging that the ETG continued to exercise Saadeh’s rights. Moreover, Saadeh was not allowed to hire Singer as his attorney in the incapacity proceedings.
At a hearing, Singer raised the issue of whether the guardianship proceedings had been vacated and whether Saadeh’s rights were restored. The ETG and the ward’s court-appointed attorney argued that the order appointing the ETG took away all of Saadeh’s rights, except the right to vote, and his rights had not been restored. The court agreed that all of his rights, with the exception of the right to vote, had been removed.
The same afternoon and without notification to Singer, the ETG had Saadeh sign a new trust agreement. Contrary to its title as an “initial revocable trust,” the trust was not revocable by Saadeh. There are disputed issues of fact as to the circumstances surrounding the execution of the trust and what Saadeh was told regarding the terms of the trust.[2] The ward’s court-appointed attorney, however, admitted that he told him that if he signed the trust, the proceedings would be over. To transfer property to the trust, the ETG executed deeds to Saadeh’s property, and Saadeh executed quit-claim deeds to some of the properties.
When the parties next appeared before the court, the court questioned whether it had “pulled the trigger” too quickly in signing the order of settlement because Saadeh was not really incapacitated. In other words, the court was concerned that it did not possess the authority to order Saadeh to enter into trusts if he were not *246 incapacitated and would have his rights restored at the end of the temporary guardianship. The court stated:
If it’s determined that he’s not incapacitated, then it seems to me there’s no reason that the court should have entered this settlement agreement in the first place because he should be allowed to exercise his own free will with regard to this instrument.... If it’s wrong, I want to undo it.
A lengthy hearing ensued regarding whether Saadeh should have the right to choose his attorney. Both the ETG and the ward’s court-appointed attorney argued that he did not have the right to choose his attorney. Nevertheless the court permitted Saadeh to hire his own attorney. The court also reappointed an examining committee for the purpose of determining Saadeh’s incapacity. In all other respects, the guardianship continued, and Saadeh did not regain any of his rights. In fact, his attorneys had to request and receive permission for him to travel.
Each member of the new examining committee met with Saadeh and declared him fully competent and capable of managing his own affairs. At the hearing to determine incapacity, the recently retained attorney for the children as trustees under the trust contended that because of the May 21st order dismissing the incapacity hearings, there was no competency issue to be resolved. Nonetheless, the court pointed out that all parties had labored under the assumption that incapacity was still at issue. The court proceeded to consider the examining committee reports. Based upon the unanimous determination of the examining committee that Saadeh was competent, the court dismissed the petition.
Unfortunately, this did not end the litigation, far from it. Saadeh had already filed a petition to revoke the trust. In his petition, he claimed the following: 1) he had executed the trust based upon undue influence, coercion, and duress and without understanding its terms; 2) his children participated in the coercion and duress imposed on him and stood to gain substantially through the provisions of the trust; 3) he was denied the right to consult counsel of his choice; 4) the trust was inconsistent with the terms that he had previously discussed he would be willing to enter; 5) he did not agree to a trust that he could not revoke; and, 6) because he had never agreed to the trust when the settlement was presented to the trial court, a fraud on the court had been committed. The children defended as trustees and filed a declaratory judgment action to determine the validity of the trust.
Eventually, Saadeh moved for summary judgment. The three questions addressed to the court were: 1) whether the May 2009 order requiring the execution of the trust and dismissal of the incapacity proceedings was properly entered and valid; 2) whether Saadeh lacked the legal right or power to enter into the settlement or trust agreement; and 3) whether the trust agreement was void ab initio. The court did not reach the question of undue influence, coercion, duress, or fraud on the court.
The court found that the May 2009 order was entered, but it did not authorize the execution of an irrevocable trust. When the court entered the order, it was not informed of catastrophic gift tax consequences if the trust was created, nor was it informed that the trust could not be revoked by Saadeh himself. When it appointed the ETG and granted her all of the ward’s legal rights, it thereby removed them from the ward. Thus, Saadeh had no legal capacity to enter into the trust *247 agreements. Therefore, the June 2009 trust agreement was void ab initio.
In addition, while the May 2009 order provided that the execution of the trust was the least restrictive alternative to a guardianship, the court found that “[t]he implementation of a least restrictive alternative to plenary guardianship presupposes the appointment of a plenary guardian is warranted.” See § 744.344(2), Fla. Stat. (2008). If the court does not find a need for a plenary guardianship, then there is no need for a least restrictive alternative. The court could not order any less restrictive alternative before it found incapacity on the part of the ward. Finally, the court found that the trust went beyond the terms of the order in that the trust was executed as an irrevocable trust with very significant tax consequences. For these reasons, the trial court determined the trust was void ab initio and ordered the return of the trust assets to Saadeh. From this order, the trustees appeal.
The co-trustees attack the trial court’s final judgment by first arguing that the May 2009 agreed order was final, but not appealed; therefore, it is no longer subject to attack. They cite, however, to cases involving a voluntary dismissal of proceedings. This was not a voluntary dismissal, but rather an allegedly agreed settlement and a mutual dismissal. They also contend that the court was without jurisdiction to vacate the May 2009 order of dismissal because there was no incapacity petition pending due to its earlier dismissal. We disagree.
First, the statutes and rules do not provide for the dismissal of a petition to determine the incapacity of an individual before the actual determination of the issue. In Borden v. Guardianship of Borden-Moore, 818 So.2d 604 (Fla. 5th DCA 2002), the court held that a petition for guardianship could not be dismissed before receiving the report of the examining committee:
Section 744.331 contemplates that once a facially sufficient petition to determine incapacity has been filed, the court must ensure that the alleged incapacitated person has an attorney, that an appropriately qualified examining committee promptly examines the person, and that an adjudicatory hearing be set no more than fourteen days after the filing of the report of the examining committee, unless good cause is shown to extend that time. Compliance with the requirements of section 744.331 is mandatory and the trial court’s failure to adhere to those requirements constitutes reversible error.
Id. at 608-09. See § 744.331(4), Fla. Stat. (2008); see also In re Keene, 343 So.2d 916, 917 (Fla. 4th DCA 1977) (“Proceedings to determine the competency of a person are generally controlled by statute and where a statute prescribes a certain method of proceeding to make that determination, the statute must be strictly followed.”) (citation omitted). An attorney for the person may not waive an adjudicatory hearing when required. See In re Frederick, 508 So.2d 44, 45 (Fla. 4th DCA 1987).
There is good reason for such a rule. If a person is incompetent, it is the duty of the court to assure that person’s protection and his or her autonomy is respected to the greatest extent possible. See § 744.1012, Fla. Stat. (2008). To permit dismissal of proceedings where a party is in fact incompetent may endanger that person. On the other hand, without knowing whether the person is actually incompetent, the court could restrict a person’s independent ability to deal with his property and place it out of the control of a *248 person who may be completely capacitated. The guardianship statutes and rules should not be used to protect competent persons from then* spendthrift ways or to protect their beneficiaries. An individual who is competent should not be subject to the control of the courts through guardianship proceedings, temporary or plenary.
That the order dismissing the plenary guardianship proceedings was a nullity is further supported by the fact that the order did not dismiss the petition for emergency temporary guardian, revoke the letters of guardianship, or terminate the same. Section 744.3031(1), Florida Statutes (2008), permits the appointment of an ETG only after a petition for determination of incapacity has been filed. For an ETG to be appointed there must be a pending determination of incapacity. As such, the court could not dismiss the petition for incapacity and retain the ETG. Unfortunately, that is what occurred in these proceedings.
The ETG, and even court-appointed counsel for Saadeh, never intended to restore any rights to him during the period of the temporary guardianship, and their statements to the court that all of Saadeh’s rights had been removed were made at a hearing on the same day he executed the trust agreement. At a separate hearing, the attorney for the children as trustees also told the court that because of the appointment of the ETG, Saadeh could not be a trustee of his own trust. Thus, the trustees acknowledged that the appointment of the ETG deprived Saadeh of all of his rights. Because all parties relied on the ETG’s appointment as depriving Saa-deh of the ability to exercise all rights, they are now judicially estopped from taking the position that the incapacity proceedings were final. See Blumberg v. USAA Cas. Ins. Co., 790 So.2d 1061, 1066 (Fla.2001). Because the order did not dismiss the ETG proceedings and restore Saadeh’s rights, it was legally impossible to continue to deprive Saadeh of his rights unless incapacity was determined. The court, recognizing its mistake in entering the order which purported to dismiss the incapacity proceedings, appointed the new examining committee. Then, when the examining committee unanimously found that Saadeh was completely competent, it appropriately dismissed the petition for determination of incapacity and terminated the ETG. The court was within its authority in these rulings.
We agree with the trial court that when the court conferred the ward’s rights on the ETG, it removed them from the ward; both cannot simultaneously exercise those rights. Section 744.3031(1) provides that the court shall specify the rights to be exercised by the ETG. In this case, the order delegated to the ETG all legal rights, reserving only the right to vote to the ward. Thus, the court removed the ward’s right to contract. The fact that the court removed his right to contract was specifically discussed not only in the original hearing appointing the ETG but in almost every other hearing thereafter.
To permit both a ward and the guardian to exercise the right to contract would render the protection afforded by an ETG non-existent. In such cases, the ward could continue to deal with his or her property and conceivably give it all away while a petition for incapacity is pending even though that person’is incompetent but not officially adjudicated as such. The ETG would be faced with the difficult task of recovering missing property.
This case is distinguishable from Holmes v. Burchett, 766 So.2d 387 (Fla. 2d DCA 2000). In Holmes, an ETG was appointed for the ward. Id. at 388 n. 2. The trial court refused to permit an attorney retained by the ward from participating in *249 the incapacity proceedings even though, pursuant to section 744.331(2)(a), the alleged incapacitated person was entitled to substitute his or her own attorney for the one appointed by the court. Id. The appellate court granted certiorari, concluding that until the ward is declared incompetent, she is presumed competent to contract and to substitute her chosen counsel. Id. However, in Holmes there is no mention as to what rights were conferred on the ETG. Thus, the opinion does not stand for the proposition that even though the legal right to contract is removed from a ward, the ward may still contract until found incapacitated.
In re Guardianship of Graham, 963 So.2d 275 (Fla. 4th DCA 2007) is more on point. In that case, a petition to determine the incapacity of the ward was filed, and an ETG with plenary authority over the ward’s person and property was appointed, much like the ETG authority in this case. See id. at 276-77. The trial court did not adjudicate the ward incapacitated before the ward filed a motion to substitute counsel, which the trial court denied. See id. On petition for writ of certiorari to this Court, we denied the petition on the ground that where the ward’s right to contract had been removed by the appointment of a plenary guardian, she did not possess the right to contract and enter into an agreement with the attorney. See id. at 278. Graham is consistent with the trial court’s conclusion that where an ETG is granted the right to contract, the ward can no longer exercise that power.
As found by the trial court in granting summary judgment, at the time of the execution of the trust, the right to contract had been removed from Saadeh, as the parties acknowledged to the court the day that the trust was signed. Section 736.0402(1), Florida Statute (2008), provides that “[ajtrust is created only if: (a) the settler has capacity to create a trust.” § 736.0402(l)(a), Fla. Stat. (2008) (emphasis added). Thus, because Saadeh had no legal right to execute the trust, the trust was invalid and void. The trial court’s ruling was correct.
With respect to the issues raised in connection with the remaining orders on appeal, we find no error.

Affirmed.

WARNER, DAMOORGIAN and CONNER, JJ., concur.

. The five orders include: 1) "Order Dismissing Incapacity Proceedings” dated September 9, 2009; 2) "Order on November 10, 2009 Hearing Re Saadeh’s Motion to Strike Co-Trustees’ Motion to Dismiss” nunc pro tunc to November 10, 2009; 3) "Order Granting Motion for Partial Summary Judgment and Rendering Final Judgment” dated December 22, 2009; 4) “Order on Karim Saadeh’s Motion to Enforce Judgment and Release Funds to Karim H. Saadeh and for Attorney Fees” dated March 23, 2010; and 5) "Order Granting Saadeh's Amended Motion to Dismiss” dated September 17, 2010.

. The ETG prepared an affidavit which Saa-deh signed, stating that he had executed the trust agreement voluntarily. However, Saa-deh has continually testified that he was misled as to the terms of the trust and that his execution was not voluntary. He was told that the execution of the trust was the only way he could end the guardianship proceedings and get his life back to normal.