# Supreme Court of Florida

_____

No. SC16-1312
_____

**GLENDA MARTINEZ SMITH,**
Petitioner,

vs.

**J. ALAN SMITH,**
Respondent.

[August 31, 2017]

LABARGA, C.J.

This case is before the Court for review of the decision of the Fourth District

Court of Appeal in Smith v. Smith, 199 So. 3d 911 (Fla. 4th DCA 2016). The

district court certified the following question to be of great public importance:

> WHERE THE FUNDAMENTAL RIGHT TO MARRY HAS NOT
> BEEN REMOVED FROM A WARD UNDER SECTION
> 744.3215(2)(a), FLORIDA STATUTES, DOES THE STATUTE
> REQUIRE THE WARD TO OBTAIN APPROVAL FROM THE
> COURT PRIOR TO EXERCISING THE RIGHT TO MARRY,
> WITHOUT WHICH APPROVAL THE MARRIAGE IS
> ABSOLUTELY VOID, OR DOES SUCH FAILURE RENDER THE
> MARRIAGE VOIDABLE, AS COURT APPROVAL COULD BE
> CONFERRED AFTER THE MARRIAGE?

Smith v. Smith, 195 So. 3d 416, 416 (Fla. 4th DCA 2016). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. For the reasons discussed below, we quash the decision of the Fourth District and hold that where the right to contract has been removed under section 744.3215(2)(a), Florida Statutes (2016), the ward is not required to obtain court approval <u>prior</u> to exercising the right to marry, but court approval is necessary before such a marriage can be given legal effect.

**OVERVIEW**

When a person is deemed incapacitated, a guardianship court may remove some of his or her rights. <u>See</u> § 744.331, Fla. Stat. (2016).[1] Section 744.3215, Florida Statutes (2016), titled "Rights of persons determined incapacitated," separates the rights of an incapacitated person into three distinct categories: rights retained by the incapacitated person (or rights that cannot be removed through incapacity proceedings); rights that can be removed and delegated to a guardian;

---

1. Before a right can be removed from an incapacitated person, section 744.331(3)(a) requires the guardianship court to appoint a three-member examining committee, of which one member must be a psychiatrist or other physician. Each of the remaining members must be a physician, nurse, "or other person who by knowledge, skill, experience, training, or education may, in the court's discretion, advise the court in the form of an expert opinion." <u>Id.</u> Each committee member is required to conduct a comprehensive examination of the person to "determine the alleged incapacitated person's ability to exercise those rights specified in [section] 744.3215," and each member must submit a written report with his or her findings. § 744.331(3)(e), Fla. Stat. An adjudicatory hearing must then be held, and "the partial or total incapacity of the person must be established by clear and convincing evidence." § 744.331(5)(c), Fla. Stat.

and rights that can be removed, but not delegated to a guardian. The right to marry falls within the latter category, under section 744.3215(2)(a), which provides:

> (2) Rights that may be removed from a person by an order determining incapacity but not delegated to a guardian include the right:
>> (a) To marry. If the right to enter into a contract has been removed, the right to marry is subject to court approval.

Consequently, a guardianship court may remove an incapacitated person's right to marry if there is clear and convincing evidence that he or she is incapacitated with respect to that right. Id.; § 744.331(6), Fla. Stat. However, even when a guardianship court does not remove the right to marry, an incapacitated person's right to marry becomes "subject to court approval" when his or her right to contract has been removed. § 744.3215(2)(a), Fla. Stat. The question presented in this case is whether court approval must be obtained before the incapacitated person marries.

## FACTS AND PROCEDURAL HISTORY

This annulment challenge is an offshoot of a guardianship case initiated by the daughter of Respondent, J. Alan Smith (Alan), in 2010 after Alan was involved in an automobile accident in which he suffered head trauma. Smith, 199 So. 3d at 911; id. at 914 (Warner, J., dissenting); see also Martinez v. Guardianship of Smith, 159 So. 3d 394, 396 (Fla. 4th DCA 2015). According to Alan's daughter, Alan was no longer competent to handle his financial affairs or care for his

- 3 -

property as a result of his diminished mental capacity. In April 2010, Alan was determined to be partially incapacitated. Alan's right to contract and his right to manage property were removed and delegated to John Cramer, who was appointed to be Alan's limited guardian of property. However, the court specifically found there was "no incapacity on the part of [Alan] that would warrant a guardian of a person." The court issued an Order that provided:

> The following rights of the Ward are delegated to the Guardian appointed by this Order:
> [X] to Contract,
> [X] to manage the property of the Ward
> Note: If the right of the Ward to Contract has been delegated to the Guardian but the right to marry is retained, then the right to marry is subject to Court approval.[2]

(Emphasis added.)

It is undisputed that Petitioner, Glenda Martinez Smith (Glenda), met and became engaged to Alan before he was deemed incapacitated. In 2009, the year prior to his accident, Alan executed a Designation of Health Care Surrogate and Living Will Declaration naming Glenda as his health care surrogate and preneed guardian.[3] Alan also gave Glenda durable power of attorney.

---

2. This provision tracks the language in section 744.3215(2)(a).

3. A preneed guardian is someone who has been designated to serve as a person's guardian in the event that person is declared incapacitated. See § 744.3045(1), Fla. Stat. (2016).

In December 2011, Glenda and Alan were married. Court approval was not obtained prior to the marriage ceremony. However, Glenda asked Cramer to seek court approval on two separate occasions, but Cramer refused.

Alan's court-appointed counsel, Lynne Hennessey, filed a petition for annulment in early 2013 based solely on the assertion that the marriage was void because court approval had not been obtained prior to the act of marriage. Glenda then moved to ratify the marriage, and Hennessey moved for summary judgment. After a hearing, the court denied Glenda's motion and granted Hennessey's motion, concluding section 744.3215(2)(a) requires prior court approval because the "statute does not contemplate the right to ratify or somehow prove an existing marriage." Because neither Alan nor Glenda obtained court approval before marrying, the court concluded their marriage was void and incapable of ratification.

Glenda appealed the final judgment of annulment, arguing that neither the statute nor the order that removed Alan's right to contract explicitly required prior court approval, and as such, the marriage could be ratified by obtaining approval after the marriage was solemnized. Glenda also asserted such approval had been obtained during a December 2012 hearing.[4] The Fourth District Court of Appeal

_____

4. The hearing was related to a petition to move Alan to another assisted living facility.

- 5 -

rejected Glenda's assertions and affirmed the trial court's decision.  Smith, 199 So. 3d at 912.  The district court agreed with the trial court's rationale that the plain language of the statute

> does not state that "a marriage" is subject to court approval, but rather, it states that "the right to marry" is subject to court approval. Therefore, if a person deemed incapacitated has had his or her right to contract removed, he or she has no right to marry unless the court gives its approval.

Id.  The district court explained that, because a "marriage entered into by a person with no right to marry is void . . . it follows that in order to enter into a valid marriage, an incapacitated person who has had his or her right to contract removed must first ask the court to approve his or her right to marry."  Id.  Accordingly, the district court held "the trial court correctly determined that the marriage was void."  Id.

> The district court also concluded that because
>
> the marriage was void from the inception, [Glenda's] argument that the court "ratified" the marriage by acknowledging it at the December 18, 2012 hearing is without merit.  A void marriage, in legal contemplation, has never existed and, therefore, cannot be ratified.  At any rate, this Court reversed the court's order stemming from the December 18, 2012 hearing and remanded for a new hearing.  By virtue of our mandate, nothing the court did on December 18, 2012 has any binding legal effect.

Id. at 912 n.1 (citations omitted).

Judge Warner disagreed with the majority's interpretation of section 744.3215(2)(a).  Id. at 913 (Warner, J., dissenting).  She found it significant both

that the statute "does not state that marriage is prohibited unless approval is given prior to the marriage" and that "the right to marry was <u>not</u> removed from [Alan] at the time of the marriage ceremony." <u>Id.</u> at 916-17 (Warner, J., dissenting). Judge Warner stated she "would hold that the failure to obtain court approval prior to the marriage at most rendered the marriage voidable, not void, so that the court could approve the union post-marriage." <u>Id.</u> at 913 (Warner, J., dissenting).

After the district court issued its decision, Glenda filed a motion to certify a question of great public importance, which the district court granted. <u>Smith</u>, 195 So. 3d at 416. This review follows.

## ANALYSIS

The certified question presents a pure question of law subject to a de novo review. <u>See</u> <u>W. Fla. Reg'l Med. Ctr. v. See</u>, 79 So. 3d 1, 8 (Fla. 2012) ("Statutory and constitutional construction are questions of law subject to a de novo review."). A court's purpose in construing a statute is to give effect to the legislative intent underlying that statute. <u>Davila v. State</u>, 75 So. 3d 192, 195 (Fla. 2011). Discerning legislative intent requires a court to look first to the plain language of the statute. <u>Id.</u> When the language is unambiguous and conveys a clear meaning, "the statute must be given its plain and obvious meaning." <u>Id.</u> at 195-96 (quoting <u>Velez v. Miami–Dade Cty. Police Dep't</u>, 934 So. 2d 1162, 1164 (Fla. 2006)). "When necessary, the plain and ordinary meaning can be ascertained by reference

to a dictionary." Bennett v. St. Vincent's Med. Ctr., Inc., 71 So. 3d 828, 839 (Fla. 2011). An unambiguous statute cannot be construed "in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications." McLaughlin v. State, 721 So. 2d 1170, 1172 (Fla. 1998) (quoting Holly v. Auld, 450 So. 2d 217, 219 (Fla. 1984)). However, when a statute is subject to more than one interpretation, the rules of statutory construction should be applied to resolve the ambiguity. Greenfield v. Daniels, 51 So. 3d 421, 425 (Fla. 2010). This may include an examination of the statute's legislative history and the purpose behind its enactment. W. Fla. Reg'l Med. Ctr., 79 So. 3d at 9.

The certified question asks whether the failure to obtain court approval pursuant to section 744.3215(2)(a) renders the ward's marriage "void" or "voidable." To resolve the matter, we will first discuss the meaning of these terms as traditionally defined by Florida precedent in the marital context. Then, we will look to the plain language of section 744.3215(2)(a) and the legislative history of the Florida Guardianship Laws to ascertain whether the Legislature intended either of these terms to apply to the disputed provision.

## "Void" and "Voidable" Marriages

Although the right to marry is considered a fundamental right, it is not unconditional. A marriage may be rendered invalid either by statute or circumstance. As this Court has explained,

- 8 -

[t]o constitute a valid marriage, the marital contract must be voluntarily entered into in good faith for the purposes actuating such contracts, the parties must be legally eligible to make the contract, and their status must be such that the union will not be contrary to public policy or obnoxious to the prevailing social mores.

Goldman v. Dithrich, 179 So. 715, 717 (Fla. 1938).

An invalid marriage has traditionally been considered either void or voidable. "A marriage is considered voidable . . . when it is possible for the parties to subsequently ratify it when there has been removed a disabling or voiding impediment which was unknown to both parties at the time the invalid marriage was originally contracted." Jones v. Jones, 161 So. 836, 838 (Fla. 1935). In other words, it is possible for a voidable marriage to ripen into a valid marriage if it is ratified by the parties. For example, minors who get married without parental consent may later ratify the marriage once they reach the age of majority. See, e.g., Needam v. Needam, 33 S.E.2d 288 (Va. 1945). Likewise, a marriage entered into where a party lacks mental capacity (due to intoxication, for example) may later be ratified upon regaining capacity. See, e.g., Mahan v. Mahan, 88 So. 2d 545, 548 (Fla. 1956) (holding marriage entered into while intoxicated is invalid unless later ratified by the parties); see also Prine v. Prine, 18 So. 781, 785 (Fla. 1895) (recognizing it is "well established that a marriage, invalid at the time for want of mental capacity, may be ratified and made valid afterwards by any acts or conduct which amount to a recognition of its validity."). Importantly, a "voidable

marriage is good for every purpose until avoided[;] it can be attacked only in a direct proceeding during the life of the parties." Kuehmsted v. Turnwall, 138 So. 775, 777 (Fla. 1932) (emphasis added) (citing 18 R. C. L. 447). Upon the death of either party, "the marriage is good ab initio." Id.

In contrast, a void marriage is generally one that is incapable of ratification or prohibited by statute. When a marriage is deemed void, "the effect . . . so far as [it] concerns the conferring of legal rights upon the parties, is as though no marriage had ever taken place." Id. (quoting 18 R. C. L. 446). Due to the harshness of declaring a marriage void, few circumstances have been identified as requiring such a result. See Mahan, 88 So. 2d at 548 ("The marriage contract is one of the most sacred of compacts. It should not be set aside or dissolved in the absence of clear and substantial proof that annulment or dissolution is justified under the law."). Historically, permanent incapacity and insanity have been among the rare circumstances which render a marriage void. Kuehmsted, 138 So. at 777 ("At the common law, the canonical disabilities of consanguinities, affinity, and impotence rendered the marriage voidable and not void, while insanity rendered it

absolutely void.”).[5]  Unlike a voidable marriage, the validity of a void marriage may be challenged at any time, including after the death of the alleged spouses.  Id.

**Plain Language of Section 744.3215(2)(a)**

The plain language of section 744.3215(2)(a) reflects that the Legislature did not intend for the type of invalid marriage at issue in this case to be classified as either void or voidable according to how these terms have been defined under Florida precedent.

The disputed provision does not use the terms “void” or “voidable,” nor does it use language that embodies the traditional definitions of these terms.  Other statutes clearly identify circumstances that render a marriage void; however, such language was not used in section 744.3215(2)(a).  For example, section 741.211, Florida Statutes (2016), is titled “Common-law marriages void,” and provides “[n]o common-law marriage . . . shall be valid.”  (Emphasis added.)  Similarly, section 741.21, Florida Statutes (2016), is titled “Incestuous marriages prohibited,” and provides that a man or woman “may not” marry certain relatives.  (Emphasis added.)  In contrast, section 744.3215(2)(a) does not expressly provide that an incapacitated person whose right to contract has been removed is “prohibited”

_____

5.  Bigamous and incestuous marriages are also considered void.  § 741.21, Fla. Stat. (2016); Jones v. Jones, 161 So. 836, 832 (Fla. 1935) (recognizing bigamous marriages as void).

- 11 -

from marrying unless court approval is obtained, or that any marriage entered into would be "void" absent such approval.

Moreover, the term "subject" in the disputed clause of section 744.3215(2)(a)—"the right to marry is subject to court approval"—is not defined as a condition precedent. Merriam-Webster defines the term as "contingent on or under the influence of some later action ([e.g.,] the plan is subject to discussion)." Merriam-Webster's Collegiate Dictionary 1243 (11th ed. 2014) (emphasis added). According to Webster's International Dictionary, "subject" is defined as "likely to be conditioned, affected, or modified in some indicated way: having a contingent relation to something and usu[ally] dependent on such relation for final form, validity, or significance." Webster's Third New International Dictionary 2275 (1993). In the context of section 744.3215(2)(a), "the right to marry is subject to court approval" means that the ward's right to marry is contingent on court approval, though that approval may come later in time, such as after the marriage ceremony. Although the validity of the marriage itself depends on court approval, nowhere in the statute does it provide that court approval must be obtained prior to marrying.

Unlike section 744.3215(2)(a), other provisions within the Florida Guardianship Laws expressly require court approval as a condition precedent. See generally BellSouth Telecomm., Inc. v. Meeks, 863 So. 2d 287, 291 (Fla. 2003)

- 12 -

(holding that "when the [L]egislature includes a provision in one section of a statute but excludes it in another, courts will deem the difference intentional and will assign meaning to the omission"). Section 744.3215(4), Florida Statutes (2016), lists actions a guardian may not take "[w]ithout <u>first</u> obtaining specific authority from the court." (Emphasis added.) Similarly, section 744.446(2), Florida Statutes (2016), requires "<u>prior</u> approval" by court order before a guardian can engage in certain activities, and section 744.441, Florida Statutes (2016), delineates the powers a guardian has "[a]<u>fter</u> obtaining approval of the court." (Emphasis added.) <u>See also</u> § 744.1098(1), Fla Stat. (2016) (requiring a guardian to "obtain court approval <u>prior</u> to removal of the ward" to a nonadjacent county (emphasis added)). Although these subsections are distinguishable because each addresses acts of the guardian that require court approval, and not acts by the incapacitated person, they are nonetheless illustrative of language used by the Legislature to explicitly mandate prior court approval. The fact that such language was not used in section 744.3215(2)(a) indicates the Legislature did not intend to require prior court approval.

The plain language of section 744.3215(2)(a) is likewise inconsistent with the traditional meaning of a "voidable" marriage. As previously discussed, the statute makes a ward's "right to marry" contingent on court approval if the right to contract has been removed. In other words, the ward's ability to enter into a valid

- 13 -

marriage depends on court approval. Thus, if the right to marry is not approved, any attempt by the ward to marry would result in an invalid marriage. If court approval is never obtained, the invalidity of the marriage cannot be cured, and the marriage can be given no effect. This is inconsistent with the traditional concept of a "voidable" marriage, which is "good for every purpose" until it is challenged, and "good ab initio" if it is not challenged within the parties' lifetimes. Kuehmsted, 138 So. at 777.

In sum, the critical language of section 744.3215(2)(a)—"the right to marry is subject to court approval"—should be given its plain meaning: the ward's right to marry is contingent on court approval when the right to contract is removed. However, the statute does not use the term "void" or expressly require prior court approval. Further, the word "subject" is not defined as a condition precedent. Therefore, to interpret the statute as requiring court approval prior to the marriage ceremony would impermissibly "extend, modify, or limit, its express terms or its reasonable and obvious implications." McLaughlin, 721 So. 2d at 1172 (quoting Holly, 450 So. 2d at 219). Moreover, the plain language is inconsistent with a "voidable" marriage.

Accordingly, we conclude that the Legislature did not intend for the concept of a "void" or "voidable" marriage to apply to the disputed provision. We hold that section 744.3215(2)(a) does not preclude the possibility of ratification of a

- 14 -

marriage if the court subsequently gives its approval, but an unapproved marriage is invalid and can be given legal effect only if court approval is obtained.

## Legislative History

The legislative history of the Florida Guardianship Laws further supports our conclusion. It reflects the Legislature's objective of protecting incapacitated persons from abuse and exploitation on the one hand, and upholding their rights, dignity, and quality of life on the other. Requiring court approval before a ward may into enter a valid marriage, while also allowing for subsequent ratification, furthers the Legislature's stated goals.

Prior to 1989, guardianship laws in Florida took an "all-or-nothing" approach that assumed "a person is either competent and capable of exercising all civil rights, or incompetent and thus incapable of making any significant personal decision." Ch. 89-96, Preamble, at 176, Laws of Fla. However, the Legislature found this approach to be "intrusive and demeaning to a person whose loss of capacity is only partial." Id. It recognized that "an untold number of individuals not in full control of their capacities [were] being taken advantage of, both financially and by having their personal rights stripped by the court without adequate supervision." Id. The Legislature even found that incapacitated persons under the then-existing guardianship laws "typically retain[ed] fewer rights than are retained by convicted felons, since most guardianship orders remove from the

individual basic rights such as the rights to vote, own property, marry, consent to medical treatment, and contract." Id. As a result, the Legislature undertook a "comprehensive set of reforms to adequately protect the rights and property" of incapacitated persons. Id. at 177. Among other changes, the option of limited guardianships was created, which the Legislature stated would "minimize the invasion of a ward's privacy and fundamental rights and . . . preserve the ward's dignity and self respect." Id. at 176. The Legislature also specified that courts "should take a more proactive and affirmative role in guardianship matters, rather than wait . . . until an abuse of the system is brought to its attention." Id. at 177.

Protecting the rights of incapacitated persons was likewise considered when section 744.3215(2)(a) was amended in 2006 to include the now-disputed provision. The staff analysis to that bill stated that the amendment "reinforc[es] the significance of the right to marry." HB 457 (2006) Staff Analysis (March 26, 2006). Further, the bill incorporated the recommendations of several groups, including the Guardianship Task Force.[6] Id. In its report, the Task Force stated it "focused on the premise that the court must consider the least restrictive alternatives to ensure each individual's dignity." Guardianship Task Force, Final

---

6. In 2003, the Guardianship Task Force was created within the Department of Elder Affairs in order "to examine guardianship and incapacity and make recommendations to the Governor and the Legislature for the improvement of guardianship and incapacity practice." Ch. 2003-262, § 4(1), at 2712, Laws of Fla.

Report at 8 (2004). The Task Force also "spent a significant amount of time debating the concept of the right to marry being a contractual right," and as such, whether the right to marry should be removed if the right to contract is removed. Id. However, the Task Force ultimately recommended that the right to marry should not be automatically removed when the right to contract is removed, especially considering that the right to marry is a fundamental right. Id. Instead, it recommended that the right to marry be "subject to court approval so that the judge can determine if the ward understands the marriage contract and that the ward is not a likely victim of abuse or financial exploitation." Id.

The legislative intent, as declared in section 744.1012, Florida Statutes (2016), further illustrates the goal of protecting incapacitated persons from exploitation while upholding their rights. Section 744.1012 provides:

> (1) Adjudicating a person totally incapacitated and in need of a guardian deprives such person of all her or his civil and legal rights and that such deprivation may be unnecessary.
>
> (2) It is desirable to make available the least restrictive form of guardianship to assist persons who are only partially incapable of caring for their needs and that alternatives to guardianship and less restrictive means of assistance, including, but not limited to, guardian advocates, be explored before a plenary guardian is appointed.
>
> (3) By recognizing that every individual has unique needs and differing abilities, it is the purpose of this act to promote the public welfare by establishing a system that permits incapacitated persons to participate as fully as possible in all decisions affecting them; that assists such persons in meeting the essential requirements for their physical health and safety, in protecting their rights, in managing their

financial resources, and in developing or regaining their abilities to the maximum extent possible; and that accomplishes these objectives through providing, in each case, the form of assistance that least interferes with the legal capacity of a person to act in her or his own behalf. This act shall be liberally construed to accomplish this purpose.

(Emphasis added.) This expression of legislative intent, combined with the legislative history of the Florida Guardianship Laws, demonstrates the Legislature's consistent efforts to uphold incapacitated persons' rights to the greatest extent possible. Therefore, the Legislature likely did not intend for section 744.3215(2)(a) to render a ward's unapproved marriage absolutely void, particularly in cases such as this, where the ward was not deemed incapacitated with respect to his right to marry, the parties were engaged prior to his incapacitation, the guardian was asked twice to obtain the court's approval, and there is no evidence whatsoever of abuse or financial exploitation.

Similarly, to interpret section 744.3215(2)(a) as rendering a ward's unapproved marriage merely voidable would undermine the Legislature's efforts to safeguard a ward's inalienable right "to be protected against abuse, neglect, and exploitation." § 744.3215(1)(d), Fla. Stat. As previously discussed, if a ward whose right to contract has been removed enters into a marriage without obtaining court approval, and such a union is considered voidable, the effect is that the marriage is essentially valid "for every purpose" unless and until it is challenged in a direct proceeding during the ward's lifetime. This affords the ward and the

ward's estate little, if any, protection from financial exploitation if the ward passes away before the validity of the marriage can be challenged.

The interpretation of section 744.3214(2)(a) the Legislature likely intended—that, absent court approval, a marriage entered into by a ward whose right to contract has been removed is invalid, but ratifiable—advances both objectives of the Florida Guardianship Laws. It protects the ward and the ward's estate by allowing a court to assess the risk of abuse and exploitation before the alleged spouse acquires any rights as a result of the marriage. It also upholds the ward's fundamental right to marry to the greatest extent possible by allowing for the possibility of ratification.

**Ratification in This Case**

Glenda argues that the guardianship court did, in fact, ratify her marriage to Alan in a December 2012 hearing. When the collateral issue of Alan's marriage to Glenda arose, the couple's marriage certificate was entered into evidence without objection, although Alan's guardian, Cramer, stated that he did not think they were actually married because court approval had not been obtained. The guardianship court stated:

> [M]y concern for you, Mr. Cramer, because I'm going to look to you to make proper decisions, is that <u>Mr. Smith is married</u>, apparently to Ms. Martinez, I have a <u>certificate of marriage</u>, that right was not removed, and her testimony I struck, but the essence of her testimony that was important to me had to do with the fact that she is able to provide companionship and companion care, those two things. Now

- 19 -

for someone like Mr. Smith, it's great that he has good doctors, good nurses, and people like that from a medical point of view, but that is not [a] substitute for the type of personal ability that a spouse has to provide companion care to their spouse. Like it or not . . . <u>she is his spouse</u>, she certainly is hands-on and it is often when a spouse is in an impaired condition like that one of the real benefits, even to someone in Mr. Smith's condition, is to still see his spouse, be able to know she's there and benefit from that, so while the ETG [emergency temporary guardianship] will be plenary in nature . . . you must take into consideration what I just said about Ms. Martinez being able to have close and continuing contact . . . with her husband, because I think Mr. Smith still looks out to her. . . .

(Emphasis added.)[7] Glenda argues that these statements by the guardianship court were sufficient to ratify the marriage. We disagree.

Although the invalid marriage between Glenda and Alan is capable of ratification under section 744.3215(2)(a), it is unlikely that the Legislature intended for "court approval" to consist merely of acknowledging the existence of a marriage certificate and commenting on the alleged marriage, without issuing an order ratifying the marriage or conducting a hearing to verify that the ward understands the marriage contract, desires the marriage, and that the relationship is not exploitative. Therefore, we conclude the guardianship court's statements here were not sufficient to approve the marriage. However, the parties are not foreclosed from seeking court approval based on our decision today.

---

7. The presiding judge was subsequently disqualified for remarks made during this hearing regarding Glenda. <u>Martinez v. Cramer</u>, 111 So. 3d 206, 207 (Fla. 4th DCA 2013).

- 20 -

**CONCLUSION**

Based upon the foregoing, we answer the certified question by holding that a ward's failure to obtain court approval prior to exercising the right to marry does not render the marriage void or voidable. Instead, we conclude that under section 744.3215(2)(a), court approval is required before a ward whose right to contract has been removed may enter a valid marriage. Any marriage entered into without court approval is invalid. However, the statute does not prevent the ward or the intended spouse from seeking court approval <u>after</u> marrying in order to ratify the marriage. Accordingly, we quash the decision of the Fourth District and remand to the district court for proceedings consistent with this opinion.

It is so ordered.

PARIENTE and QUINCE, JJ., concur.
LAWSON, J., concurs specially with an opinion.
POLSTON, J., dissents with an opinion, in which LEWIS and CANADY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LAWSON, J., specially concurring.

I fully agree with the majority opinion and write to address the dissent. Obviously, this is a difficult case. Both the dissent and the majority strive to apply the plain language of this statute, but read the statute differently. I believe the majority's reading to be correct because it gives effect to all words in the statute,

- 21 -

without adding to them. While the dissent's reading gives effect to the "right to marry" language, it does so at the expense of the "subject to" language. The majority gives effect to both. In other words, the majority more faithfully construes the text "reasonably, to contain <u>all</u> that it fairly means." Antonin Scalia, <u>A Matter of Interpretation: Federal Courts and the Law</u>, 23 (Amy Gutmann ed., 1997) (emphasis added).

Saying that something "is subject to court approval" suggests authorization for ratification and does not demand prior approval, as the dissent would require. In essence, the dissent infers from the "right to marry" language that the statute really means "subject to" <u>prior</u> "court approval." Before adding a word to a statute that the Legislature did not, I would resort to the following secondary rule of construction: "Where reasonable differences arise as to the meaning or application of a statute, the legislative intent must be the polestar of judicial construction." <u>Lowry v. Parole & Prob. Comm'n</u>, 473 So. 2d 1248, 1249 (Fla. 1985) (citing <u>Tampa-Hillsborough Cty. Expressway Auth. v. K.E. Morris Alignment Servs., Inc.</u>, 444 So. 2d 926 (Fla. 1983)).

This statute is clearly intended to protect the ward from exploitation while preserving, as best as possible, the ward's fundamental right to marry. These twin goals cannot be met using our common law construct under which a marriage is classified, if not fully valid, as either voidable or void.

This case illustrates why the Legislature's intent would be thwarted by reading the statute to mean that a marriage is void if entered without prior approval. Here, the ward's committed supportive relationship pre-dated his injury by a number of years—and, the couple was engaged to be married at the time of the injury. The guardian, for reasons not clear on this record, refused to petition the court for approval of the marriage. It also appears from this record that both before and after the marriage, Glenda Martinez Smith supported and cared for Alan Smith, enhancing his quality of life consistent with the ideals of marriage. In short, it appears from this limited record that the relationship was in no way exploitative, was in the ward's best interest, and was the ward's choice. If these inferences are proven at a hearing, it would be contrary to the purpose of this statute to treat the marriage as void, with no opportunity for ratification.

It is also easy to see why the Legislature's intent would be thwarted by reading the statute to mean that a marriage entered by a ward without prior court approval is voidable. A "voidable" marriage, at common law, cannot be challenged after the death of a spouse. Kuehmsted v. Turnwall, 138 So. 775, 777 (Fla. 1932) (citing 18 R. C. L. 447). If the Legislature had chosen to make a ward's marriage voidable, a ward could be coerced or manipulated into an exploitative marriage, potentially leaving the ward's children or other relatives with no recourse if they do not discover the marriage until after the ward's death.

Because the Legislature's intent would have been thwarted by employing either common law category (of void or voidable marriages), I find it unsurprising that the Legislature chose to avoid them. I do find it perplexing, however, that the dissent seems to criticize the majority for "avoid[ing] . . . the categories of void and voidable marriages" when it was the Legislature that chose not to use them. Dissenting op. at 27. I also take issue with the dissent's critique of the majority opinion as "strictly construing the term 'subject' to mean less than it fairly means in this context but leniently construing the term 'the right to marry' to gloss over the difference in meaning with the term 'marriage.' " Dissenting op. at 27. Contrary to this assertion, the majority properly recognizes that by using the phrase "right to marry" the Legislature has foreclosed viewing the marriage as voidable because the marriage itself cannot be validated until the "right to marry" has been approved. Majority op. at 4. Then, the majority reasonably reads "subject to" as allowing for approval before or after the marriage. Majority op. at 14-15. That is not a "strict construction," as the dissent contends, but is a reasonable reading—and the only reading consistent with the clear intent of the statute. It is the dissent's construction—with its addition of a prior approval requirement—that is an unreasonable narrowing of the plain language of the statute which would produce a result inconsistent with the Legislature's intent.

- 24 -

POLSTON, J., dissenting.

Under the plain and reasonable meaning of section 744.3215(2)(a), Florida Statutes, an incapacitated person, who has had the right to contract removed, must obtain court approval prior to exercising the right to marry, without which the marriage is void.

Specifically, section 744.3215(2)(a) provides the following:

> (2) Rights that may be removed from a person by an order determining incapacity but not delegated to a guardian include the right:
>     (a) To marry.  If the right to enter into a contract has been removed, <u>the right to marry is subject to court approval</u>.

(Emphasis added.)  Consistent with section 744.3215(2)(a), the trial court issued the following order when removing Smith's rights to contract and manage property:

> The following rights of the Ward are delegated to the Guardian appointed by this Order:
>     [X] to contract,
>     [X] to manage property of the Ward
> Note: if the right of the Ward to contract has been delegated to the Guardian but the right to marry is retained, then <u>the right to marry is subject to Court approval</u>.

(Emphasis added.)

Pursuant to the plain meaning of "the right to marry is subject to court approval," the ward's ability to exercise his right to marry and enter into a marriage contract is contingent upon court approval.  As the Fourth District noted,

- 25 -

the statute's text subjects "the right to marry" to court approval, not the marriage itself, reasonably meaning that court approval must be obtained before the right to enter into the contract of marriage is exercised. See Smith v. Smith, 199 So. 3d 911, 912 (Fla. 4th DCA 2016) (explaining that the statute "does not state that 'a marriage' is subject to court approval, but rather, it states that 'the right to marry' is subject to court approval. Therefore, if a person deemed incapacitated has had his or her right to contract removed, he or she has no right to marry unless the court gives its approval."). Stated otherwise, although the incapacitated person retains the right to marry under the statute when the right to contract has been removed, the ability to validly and effectively exercise that right is dependent upon court approval. If court approval has not been obtained, the incapacitated person may not validly exercise the right, and any attempt to do so results in a void marriage. Cf. Jasser v. Saadeh, 97 So. 3d 241, 249 (Fla. 4th DCA 2012) ("[A]t the time of the execution of the trust, the right to contract had been removed from Saadeh. . . . Thus, because Saadeh had no legal right to execute the trust, the trust was invalid and void."); In re Guardianship of Bockmuller, 602 So. 2d 608, 609 (Fla. 2d DCA 1992) (denying attorneys' fees and holding that, because the ward's right to contract had been removed, the ward "had no power to contract with [counsel] to represent her" even though section 744.3215, Florida Statutes, gives incapacitated persons the right to counsel).

- 26 -

The majority avoids this plain meaning of the statute (as well as the categories of void and voidable marriages) by strictly construing the term "subject" to mean less than it fairly means in this context but leniently construing the term "the right to marry" to gloss over the difference in meaning with the term "marriage." See majority op. at 12 ("In the context of section 744.3215(2)(a), 'the right to marry is subject to court approval' means that the ward's right to marry is contingent on court approval, though that approval may come later in time, such as after the marriage ceremony. Although the validity of the marriage itself depends on court approval, nowhere in the statute does it provide that court approval must be obtained prior to marrying."). The majority recites multiple dictionary definitions of "subject," but complains that "the word 'subject' is not defined as a condition precedent." Id. at 14. The majority also faults the Legislature for failing to employ the terms "void," "voidable," "first," "prior," "after," "prohibited," or "may not." Id. at 11-14. Of course, the Legislature also failed to employ the terms "ratification" or "invalid, but ratifiable," which is what the majority says section 744.3215(2)(a) provides for. Id. at 19.

Importantly, however, construing the plain meaning of a statute is not a magic words test. Instead, "[w]ords of common usage, when used in a statute, should be construed in the plain and ordinary sense, because it must be assumed that the Legislature knows the plain and ordinary meaning of words used in

- 27 -

statutes and that it intended the plain and obvious meaning of the words used." Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co., 945 So. 2d 1216, 1225 (Fla. 2006). As Justice Scalia explained, "[a] text should not be construed strictly, and it should not be construed leniently; it should be construed reasonably, to contain all that it fairly means." Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law, 23 (Amy Gutmann ed., 1997).

In this case, the text "the right to marry is subject to court approval" fairly and reasonably means that the ward must obtain court approval before exercising the right to marry. The fact that dictionary definitions of the term "subject" do not include a specification of being a condition precedent does not change the common understanding that the approval must take place beforehand. For example, if I tell a friend that they have "the right to borrow my car subject to my approval," I am telling that friend that he or she may borrow my car but that he or she must ask for and obtain my permission before doing so. If, instead, my friend simply drives off with my car before obtaining my approval, my friend has committed a crime and stolen my vehicle. It would be commonly understood and plainly obvious that the term "subject to my approval" means that the approval to borrow my car must be obtained beforehand. The same is true with the text at issue in section 744.3215(2)(a). And construing the statute to mean all that it fairly and plainly contains is not "extend[ing], modify[ing], or limit[ing] its express terms or its

reasonable and obvious implications." Majority op. at 14 (quoting <u>McLaughlin v. State</u>, 721 So. 2d 1170, 1172 (Fla. 1998) (quoting <u>Holly v. Auld</u>, 450 So. 2d 217, 219 (Fla. 1984))).

To summarize, the plain meaning of section 744.3215(2)(a) requires an incapacitated person, who has had the right to contract removed, to obtain court approval before exercising the right to marry. Without such statutorily required court approval beforehand, the marriage is void. Accordingly, I would approve the Fourth District's decision, and I respectfully dissent.

LEWIS and CANADY, JJ., concur.

Application for Review of the Decision of the District Court of Appeal - Certified Great Public Importance

     Fourth District - Case No. 4D14-1436

     (Palm Beach County)

Jennifer Suzanne Carroll of Law Offices of Jennifer S. Carroll, P.A., Palm Beach Gardens, Florida,

     for Petitioner

No appearance for Respondent

Robert W. Goldman of Goldman, Felcoski & Stone, P.A., Naples, Florida; Kenneth B. Bell, and John W. Little, III of Gunster, West Palm Beach, Florida,

     for Amicus Curiae The Real Property, Probate & Trust Law Section of the
     Florida Bar

Ellen S. Morris of Elder Law Associates, P.A., Boca Raton, Florida; Gerald L. Hemness of Law Office of Emma Hemness, P.A., Brandon, Florida; and Cary Moss of Sawyer & Sawyer, P.A., Orlando, Florida,

for Amici Curiae The Elder Law Section of the Florida Bar and Academy of Florida Elder Law Attorneys